**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles E Kelly, II,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Medical Board, et al.,<br><br>    Defendants. | No. CV-25-00513-PHX-KML<br><br>**ORDER** |

Plaintiff Charles E. Kelly II, M.D., practiced medicine in Kingman and Lake Havasu, Arizona. In response to several complaints from former patients, defendants Arizona Medical Board, its members, its executive director, and its staff investigated Dr. Kelly and suspended his medical license. In February 2025, Dr. Kelly filed this suit alleging defendants had discriminated against him in violation of the Fourteenth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). Defendants moved to dismiss all claims. Their motion is granted.

**I.     Background**

The Board licensed Dr. Kelly to practice medicine in Arizona in 2010. (Doc. 14 at 4.) After receiving a series of complaints from former patients between 2011 and 2024, the Board revoked his license in 2025. Kelly is adamant that he is not pursuing claims based on that revocation. (Doc. 25 at 2.) Rather, this suit involves only events from 2020 through 2024.

### A. Initial Allegations

On May 8, 2020, Board staff received a complaint from one of Dr. Kelly's former patients alleging he "unnecessarily touched her breasts during [an] examination" and "opened her cheeks and wiped her" following a procedure. (Doc. 14 at 5.) In line with Board policy, the complaint was assigned to an investigator—defendant Christine Press-Haag—for initial handling. (Doc. 14 at 5.)

After the Board initiated its investigation, it learned of three additional complaints from female former patients alleging Dr. Kelly had inappropriately touched them. (Doc. 14 at 5–7, 10.) As a result of these complaints, the Board's Executive Director defendant Patricia McSorely ordered Dr. Kelly to submit to a "fitness-for-duty/psychosexual examination" with a third-party facility, Acumen. (Doc. 14 at 6.) During this evaluation, Dr. Kelly expressed concern that a competing doctor who aimed to "ruin[] his reputation and practice" spurred the patients to make accusations. (Doc. 14 at 7.)

Acumen did not diagnose Dr. Kelly with "any mental disorders or sexual deviance" but opined his behavior was likely a result of autism spectrum disorder. (Doc. 14 at 7–8.) It also noted Dr. Kelly's practice "garnered a reputation for being dirty and poorly managed" and recommended the Board investigate "whether his practice is properly equipped and maintained," even though none of the accusers had complained about these conditions. (Doc. 14 at 8.)

Based on Acumen's recommendations, McSorely prepared an Interim Consent Agreement (the "ICA") that would be effective during the pendency of the Board's investigation. The ICA required Dr. Kelly attend an intensive outpatient program with Acumen, secure a practice monitor to report on his conduct, have a licensed nurse or two medical assistants in attendance to chaperone any examination or treatment of female patients, and be subject to periodic chart reviews to monitor his compliance. (Doc. 14 at 8–9; Doc. 13-1 at 5.) If Dr. Kelly declined to agree to the ICA, McSorely planned to seek summary suspension of his medical license; if he did agree, he was assured the charges against him "would be promptly investigated and ruled on." (Doc. 14 at 9.) Dr. Kelly

- 2 -

signed the ICA on February 12, 2021.

### B. Post-February 12, 2021 Investigations

Shortly after entering the ICA, the Board received another complaint. On March 16, 2021, one of Dr. Kelly's former patients complained he had raped her during a colonoscopy on July 15, 2013. (Doc. 14 at 10.) In the following months, the Board worked with an outside medical consultant and Acumen in investigating. (Doc. 14 at 10-12.) The outside medical consultant "concluded he saw no deviations from standard of care in the treatment of the four women" who had complained. (Doc. 14 at 10.) Acumen issued a report concluding Dr. Kelly's behavior resulted from his autism diagnosis rather than "malignant or predatory" behavior. (Doc. 14 at 11.) Dr. Kelly believes this diagnosis influenced the Board's perceptions of him and "[f]rom that point on" defendants "regarded Dr. Kelly as disabled by the mental conditions diagnosed" by Acumen. (Doc. 14 at 12.) Dr. Kelly requested he be released from the ICA, the Board refused, and it instead continued its investigation and demanded patient charts from Dr. Kelly. (Doc. 14 at 10, 14.)

On November 4, 2021, McSorley convened a Staff Investigational Review Committee ("SIRC") comprised of members of Board staff and a medical consultant. That same day the SIRC issued reports addressing the pre-February 2021 accusations and recommended the Board discipline Dr. Kelly because of "alleged inability of Acumen to rule out sexual misconduct," a pattern of similar complaints from multiple, unaffiliated patients, and the existence of a similar complaint in 2011. (Doc. 14 at 16.) The Board took no action at that time. (Doc. 14 at 17.)

### C. Post-SIRC Investigations

On March 1, 2022, McSorley informed Dr. Kelly that its investigation into the pre-ICA complaints had concluded, offered him a formal interview before a review committee of Board members if he contested its findings, and notified him of the next Board meeting on April 6, 2022. (Doc. 14 at 17.) Dr. Kelly requested a formal interview, which McSorely acknowledged on March 11, 2022, but did not conduct until February 9, 2023. (Doc. 14 at 17–18.) Until then, Press-Haag continued to review and request Dr. Kelly's charts and

1 opened two more charges against him for violations of the ICA. (Doc. 14 at 18.)

2 During the interview on February 9, 2023, Dr. Kelly "learned of the Defendants' interpretation of some of the terms of the ICA never previously identified" to him. (Doc. 14 at 18.) The Board opened another charge against Dr. Kelly on June 1, 2023, for additional violations of the ICA's charting requirements. (Doc. 14 at 19.) McSorley convened another SIRC with Board staff members and a medical consultant, recommending the case be referred to a formal hearing if Dr. Kelly refused to surrender his license, which he declined to do. (Doc. 14 at 19–20.)

### D. License Suspension

On January 3, 2024, the Board voted to summarily suspend Dr. Kelly's license because of the three charges alleging ICA charting violations and the May 2021 complaint and refer the case to the Office of Administrative Hearings ("OAH") for a formal hearing. (Doc. 14 at 20.) The Board served its complaint combining the ICA charting violations and previous patient complaints against Dr. Kelly on January 25, 2024. (Doc. 14 at 20–21.) Dr. Kelly first learned of the ICA charting violation allegations in this complaint. (Doc. 14 at 20–21.)

The Administrative Law Judge conducted a formal hearing between February 23, 2024 and March 28, 2024 and filed a formal decision on August 2, 2024. (Doc. 14 at 22.) The ALJ recommended Dr. Kelly's license be revoked, concluding he had fallen below the standard of care in the treatment of his patients and failed to comply with the ICA charting requirements. (Doc. 14 at 22.)

On September 6, 2024, the Board met to review the ALJ's decision. (Doc. 14 at 23.) In its accompanying "Final Order" on September 9, 2024, the Board did not revoke Dr. Kelly's license but placed him on probation. The Final Order required Dr. Kelly enter a physician health program ("PHP") at his own expense and be chaperoned during all interactions with female patients. (Doc. 14 at 23–24.) It also imposed drug and alcohol restrictions, even though Dr. Kelly was not accused of using illegal substances or alcohol abuse. (Doc. 14 at 26.) The Final Order became effective on October 15, 2024, after Dr.

Kelly did not file for rehearing or review. (Doc. 13-4 at 4.) Dr. Kelly believes that is the end of the events relevant to this suit. In moving to dismiss, defendants provided additional information establishing Dr. Kelly's license was revoked in March 2025 and he also failed to seek rehearing or review of that order. But Kelly does not seek to challenge any of the events after October 2024, so the court ignores those later developments.[1] (Doc. 25 at 2.)

In February 2025, Dr. Kelly filed this suit. (Doc. 1.) He amended his complaint in May 2025. (Doc. 14.) The operative complaint alleges the Board, its staff, executive director, and members discriminated against Dr. Kelly in violation of the Fourteenth Amendment, the ADA, and the RA. Defendants seeks dismissal of all claims under a variety of theories, including that Dr. Kelly's failure to litigate his claims in the administrative process or in Superior Court prevent him from litigating them in this case.

**II.      Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

**III.     Discussion**

Defendants moved to dismiss Dr. Kelly's claims on the basis of absolute immunity, Eleventh Amendment immunity, *Younger* abstention, res judicata, the Board's status as a non-jural entity, and for failure to state a claim for relief. (Doc. 19 at 1.) Because Dr. Kelly's complaint is barred by res judicata, the court addresses only that basis.[2]

---

[1] Kelly's insistence that the court ignore the events after October 2024 is puzzling because one form of relief he seeks is an order requiring "[t]he Board issue an Order reinstating Dr. Kelly to full enjoyment of the practice of medicine." (Doc. 14 at 35.) Kelly has not explained how the court could issue such an order given that Kelly's license was revoked in March 2025, and he does not seek to challenge that revocation in this suit. But Kelly seeks an award of money damages in this suit and even "[p]artial amelioration of a harm . . . suffices for redressability." *Matsumoto v. Labrador*, 122 F.4th 787, 801 (9th Cir. 2024).

[2] Although not necessary to the outcome of this order, absolute immunity appears to

- 5 -

Defendants argue Dr. Kelly's complaint is barred by res judicata because it seeks to relitigate issues heard or that could have been heard by the Board, a state agency. (Doc. 19 at 19.) In some circumstances, federal courts give a state agency decision preclusive effect. There are "two steps" for determining if a state agency decision is entitled to preclusive effect. First, the court must "determine whether the state administrative proceeding was conducted with sufficient safeguards to be equated with a state court judgment." *Jamgotchian v. Ferraro*, 93 F.4th 1150, 1154 (9th Cir. 2024) (simplified). In evaluating this step, the court considers whether "the administrative agency act[ed] in a judicial capacity," whether "the agency resolve[d] disputed issues of fact properly before it," and whether "the parties [had] an adequate opportunity to litigate." *Id*. at 1154. After evaluating the first step, the court must "turn to state law to determine if, under [state law], the [agency's] decision would be given preclusive effect." *Id.* (simplified). Provided both steps are satisfied, the state agency decision is given preclusive effect.

Dr. Kelly's current claims center on the Board's January 2024 summary suspension order and Final Order in September 2024. (Doc. 14 at 35.) Dr. Kelly does not argue the state agency proceedings leading up to those orders lacked sufficient safeguards. After the Board published its "Interim Findings of Fact and Conclusions of Law" on January 5, 2024, Dr. Kelly was given notice of his right to a formal hearing with an ALJ, requested a hearing, and received a hearing at which he was represented by counsel, testified on his own behalf, and presented evidence. (Doc. 13-2 at 2; Doc. 13-3 at 21–25.) Instead of accepting the ALJ's recommendation revoking Dr. Kelly's license, the Board placed him on probation in its September 6, 2024 order. (Doc. 13-3 at 28.) Dr. Kelly received notice that "filing of a motion for hearing or review is required to preserve any rights of appeal to the Superior Court," but declined to seek additional review. (Doc. 13-3 at 34.)

---

provide an alternative basis for dismissing Kelly's claims against most, if not all, defendants. *See Olsen v. Idaho St. Bd. of Medicine*, 363 F.3d 916, 923-25 (9th Cir. 2004) (collecting and discussing cases holding medical board officers are entitled to absolute immunity); *Mishler v. Clift*, 191 F.3d 998, 1004 (9th Cir. 1999) (collecting cases holding medical board functions of "investigating charges, initiating charges, weighing evidence, making factual determinations, determining sanctions, and issuing written decisions" are "functionally comparable to duties performed by courts and prosecutors" and therefore entitled to absolute quasi-judicial and quasi-prosecutorial immunity).

1   The administrative forum's proceedings were adequate here. Dr. Kelly received notice of the hearings, the opportunity to be represented by counsel, and had the opportunity to present evidence in his defense. *Olson v. Morris*, 188 F.3d 1083, 1086 (9th Cir. 1999) (finding proceedings adequate where Arizona Board of Psychologist Examiners conducted hearing, allowed doctor to attend and be represented by counsel, and present evidence); *Dommisse v. Napolitano*, 474 F. Supp. 2d 1121, 1124, 1131 (D. Ariz. 2007), *aff'd*, 340 F. App'x 384 (9th Cir. 2009) (finding decision of Arizona Medical Board barred by res judicata where doctor provided evidentiary hearing). The administrative proceeding had "sufficient safeguards to be equated with a state court judgment." *Jamgotchian*, 93 F.4th at 1154 (simplified).

The second step for applying res judicata asks whether Arizona law would give the result of the administrative proceeding preclusive effect. In a closely analogous context, the Ninth Circuit gave preclusive effect to license revocation proceedings by the Arizona Board of Psychologist Examiners. In that case, the court noted "[u]nder Arizona law, a party's failure to appeal a final administrative decision makes that decision final and res judicata," barring subsequent claims "not only upon facts actually litigated but also upon those points that might have been litigated." *Olson*, 188 F.3d at 1086 (citing *Hawkins v. State, Dept. of Economic Sec.*, 900 P.2d 1236, 1239–40 (Ariz. 1995)); *Gilbert v. Bd. of Med. Examiners of State of Ariz.*, 745 P.2d 617, 624 (Ariz. Ct. App. 1987) (failure to timely appeal the decision of the Board means the decision is "conclusively presumed to be just, reasonable and lawful").

Despite this clear statement, Dr. Kelly appears to argue the Ninth Circuit misinterpreted Arizona law. He argues Arizona follows the "same evidence" test when applying res judicata and under that test his current claims can proceed. (Doc. 25 at 9.) Dr. Kelly is correct that intermediate Arizona appellate courts have at times followed the "same evidence" test that prevents application of res judicata where the subsequent action "recast[s plaintiff's] claims under new theories, implicating somewhat different facts than those involved in the prior action." *Phoenix Newspapers, Inc. v. Dep't of Corr., State of*

*Ariz.*, 934 P.2d 801, 805 (Ariz. Ct. App. 1997). That opinion by the Arizona Court of Appeals noted "[t]he same evidence test has fallen into disuse in recent years," but concluded Arizona law still required its application. *Id*. at 804. After that opinion, however, the Arizona Supreme Court described res judicata as applying "when a former judgment on the merits was rendered by a court of competent jurisdiction and the matter now in issue between the same parties or their privities was, *or might have been*, determined in the former action." *Hall v. Lalli*, 977 P.2d 776, 779 (Ariz. 1999) (emphasis added). And again in 2019, the Arizona Supreme Court stated "a final judgment may preclude later litigation of other causes of action based on the transaction or series of transactions out of which an action arises, considering whether the facts are related in time, space, origin, or motivation." *Crosby-Garbotz v. Fell in & for Cnty. of Pima*, 434 P.3d 143, 148 (Ariz. 2019) (quotations omitted). The Ninth Circuit's explanation of Arizona's test for res judicata appeared in 1999, two years after the Arizona Court of Appeals's *Phoenix Newspapers* decision, and the Arizona Supreme Court has subsequently affirmed the logic on which *Olson* was based. In these circumstances the Ninth Circuit's view must be followed.

      Having determined res judicata applies to the administrative proceedings in this case, the final question is whether Dr. Kelly's current claims are ones "that might have been litigated" before the Board. *Olson*, 188 F.3d at 1086. Dr. Kelly could have done so. Arizona's scheme for agency findings and review by the superior court allow for a party to raise "all factual and legal matters at issue in the agency decision." *Bullock v. Arizona Bd. of Regents*, No. CV-24-00520-TUC-SHR, 2025 WL 275938, at *5 (D. Ariz. Jan. 23, 2025) (superior court's review of administrative decisions "includes all factual and legal matters at issue in the agency decision"); A.R.S. § 12-910(F) ("After reviewing the administrative record and supplementing evidence presented at the evidentiary hearing . . . the [superior] court shall decide all questions of law, including interpretation of a constitutional and statutory provision" and "questions of fact" at issue). During his administrative proceedings, Dr. Kelly could have but declined to raise any of the claims he is now attempting to litigate. *See Olson*, 188 F.3d at 1086–87 ("If [appellant] had constitutional

defenses to the Board's proceedings, he had every right to raise them with the Board or on appeal in state court."); *Gilbert*, 745 P.2d at 623 ("No matter how you label it, the present action is a collateral attack on the administrative decision revoking the license under the guise of a complaint sounding in tort. [Plaintiff] can prevail on the tort claims *only* by proving that the revocation was improper."); *see also Dommisse*, 474 F.Supp.2d at 1131 ("The constitutional issues [plaintiff] advances in the instant action could have been brought before the Board or on appeal before the state court."). Accordingly, Dr. Kelly's claims are barred by res judicata and he cannot reanimate them now.

Finally, Dr. Kelly argues he should be allowed to pursue his claims against the defendants now sued in their individual capacities because those individuals were not parties to the previous litigation. (Doc. 25 at 12.) But the plaintiffs in the most analogous cases also sued members of state boards and their investigators. *Gilbert*, 745 P.2d at 173-74 (barring plaintiff from suing Arizona Medical Board members and individual appointed as investigator); *Olson*, 188 F.3d at 1085-87 (barring plaintiff from suing Arizona Board of Psychologist Examiner members and investigators). Those cases explicitly recognized res judicata requires the previous suit involve "the same parties or their privies," and then applied res judicata to board members and investigators. *Gilbert*, 745 P.2d at 174; *Olson*, 188 F.3d at 1086. At least in the unique context of later suits seeking to challenge actions by state boards, Arizona law deems members of the state boards and their investigators privies of the boards themselves.

## IV. Leave to Amend

In general, "[t]he court should freely give leave" to amend a complaint. Fed. R. Civ. P. 15(a)(2). But leave to amend is not appropriate when "'the amended complaint would be subject to dismissal.'" *Californians for Renewable Energy v. Cal. Pub. Utils. Comm'n*, 922 F.3d 929, 935 (9th Cir. 2019) (quoting *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)). Dr. Kelly has not offered any plausible argument that he would be able to amend his complaint to avoid application of res judicata. Leave to amend is not appropriate.

/

Accordingly,

**IT IS ORDERED** the Motion to Dismiss (Doc. 19) is **GRANTED**. The Clerk of Court shall enter judgment in favor of defendants and close this case.

Dated this 11th day of December, 2025.

*Krissa M. Lanham*
Honorable Krissa M. Lanham
United States District Judge